UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DAN WILSON,<br><br>     Plaintiff,<br><br> v.<br><br>SAFEWAY INC., a foreign corporation, d/b/a SAFEWAY STORE #3521 (SAFEWAY),<br><br>     Defendant. | NO: 2:16-CV-0405-TOR<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

BEFORE THE COURT is Defendant Safeway Inc.'s Motion for Summary Judgment (ECF No. 21). The Court held a hearing in Spokane, Washington on September 11, 2018 and heard oral argument from the parties. The Court has reviewed the files and the record, and is fully informed. For the reasons discussed below, Defendant's Motion (ECF No. 21) is **granted**.

## STANDARD OF REVIEW

A movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* The moving party bears the "burden of establishing the nonexistence of a 'genuine issue.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.*

Only admissible evidence may be considered. *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002). The nonmoving party may not defeat a properly supported motion with mere allegations or denials in the pleadings. *Liberty Lobby*, 477 U.S. at 248. The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* at 255. However, the "mere existence of a scintilla of evidence" will not defeat summary judgment. *Id*. at 252. Further, the court need not, and will not, "scour the record in search of a genuine issue of triable fact." *Keenan v.*

*Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The opposing party must present significant and probative evidence to support its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  "[U]ncorroborated and self-serving testimony" alone will not create a genuine issue of material fact.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

## BACKGROUND[1]

The instant action involves several claims by Plaintiff Dan Wilson against his past-employer, Defendant Safeway Inc., for alleged (1) disability discrimination in violation of the Washington Law Against Discrimination (WLAD), RCW § 49.78.010, *et seq.*, (2) violation of the Washington Family Leave Act (WFLA), RCW 49.78.010, *et seq.*, and (3) wrongful discharge in violation of public policy.  ECF No. 1-1 at 5-6, ¶¶ 3.1-5.5.

Plaintiff began working at Safeway in 1985.  ECF No. 22 at 2.  By August 2001, Plaintiff was promoted to Acting Meat Department Manager and then Meat Department Manager soon thereafter.  ECF No. 22 at 2.  Unbeknownst to

---

[1]     The underlying facts are generally not in dispute.  The facts are predominately gleaned from the deposition of Plaintiff or otherwise supported by uncontradicted affidavits.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 3

Defendant, Plaintiff began drinking around two bottles of wine (or eight drinks) per day during 2014. ECF No. 23-1 at 5.

A. **Plaintiff's work performance before taking leave**

Jackie Katanik, District Manager for Safeway, oversaw several Safeway stores (including overseeing sales, gains, profits, food safety, safety of stores, and their store standards and services), including the Safeway where Plaintiff worked. Ms. Katanik became familiar with Plaintiff in March, 2014. ECF No. 27-1 at 4, 6. Around this time, Ms. Katanik first started inspecting the East Wenatchee store and identified problems in the meat department: "it was not dating the cooler. Their trim pans, it was old meat, a ton of out-of-stocks. The Department was just filthy dirty and not being cleaned on a regular basis and temps weren't being adhered to." ECF No. 27-1 at 8. Ms. Katanik testified that Plaintiff had other issues:

> Just leading his team and getting, you know, the job done. And, you know, when you'd go in in the morning, he wasn't, you know, filling the holes, making a proper cutting list. And he wasn't leading his team. The department was running him. It wasn't him running the department.

ECF No. 27-1 at 9. Ms. Katanik did not see improvement in the Meat department while Plaintiff remained in his position. ECF No. 27-1 at 13.

Jason Helaas, the "meat merchandiser" for Safeway, ECF No. 23-1 at 23, who oversees the meat departments within "District 31" for Safeway, ECF No. 24 at ¶ 4, visited Plaintiff's meat department on April 29, 2015. ECF No. 25 at ¶ 10.

Jason Helaas wrote a letter to Laura Villalobos, then Store Director (*a.k.a.* Store

Manager), ECF No. 27-1 at 59, expressing his concern about Plaintiff not working

during his shifts and the condition of the meat department:

> While visiting your store today, I was questioning why The Meat Manager wasn't working the Tuesday after inventory--again?  After digging in further I found "many"-"many" clocking issues that should have been addressed (probably) months ago (maybe longer)…  I had Jean Luc pull clocking data on Dan (Meat mgr) and what I found was ***extremely shocking!*** (I have attached the date from the last month.). . . .  You are in the middle of a service crises – not to mention being short handed in the meat department – and you allow Dan the freedom to come and go when he pleases????  I am already disappointed with standards and service in the meat department and for you to allow this is very concerning to me.  I need to see immediate disciplinary action . . . .  Also I need 100% commitment from Dan that he will run this shop to the best of his ability and strive to the best ***or*** step aside. I am done with his lack of enthusiasm and unwillingness to build his team in a positive way.  I need a leader in the meat department, not a person who is milking the clock waiting for retirement.  It is easy to see with my eyes what your customer are seeing everyday. . .  Let's get it fixed! Thanks

ECF No. 25-1 at 2 (emphasis in original).  Notably, Plaintiff testified that he was

praised for leaving work early.  ECF No. 26 at 3, ¶ 10.

Jeffrey Mullings, a Meat Department Manager for Safeway at a different

store location (Store Number 1449), filled in for Plaintiff at Plaintiff's store (Store

Number 3521) in early May of 2015.  ECF No. 24 at ¶ 5.  According to Mr.

Mullings:

> While filling in for [Plaintiff], I noticed in the meat department quite a few violations of Safeway's policies and procedures.  For example, in the cooler, I found undated or out of date product, which are policy violations.  I also observed trimming violations.  Meat trimmings larger than the size of a golf

ball should be repurposed into meat products, such as stir-fry or stew meat. I found many trimmings as large as my hand discarded in the meat lugger (a container), another policy violation. During my time at Store Number 3521, meat department staff informed me that [Plaintiff] frequently was not following the schedule as he had been arriving to work late, leaving work early, and frequently taking two (2) hour lunches. These schedule violations surprised me as the Store Managers expect the Meat Department Managers to follow the posted schedules. I reported these violations and employee concerns to Jean-Luc Gibassier. Jean-Luc told me that he was going to address these issues with [Plaintiff] when [Plaintiff] returned to work. A day or two later, Jean-Luc again asked me to cover [Plaintiff's] shift at Store Number 3521. Jean-Luc told me that [Plaintiff] had showed up to his shift an hour and a half late, and that when [Plaintiff] eventually came to work, Jean-Luc sent [Plaintiff] home.

ECF No. 24 at ¶¶ 6-8.

In early May, 2015, Plaintiff arrived late for work[2] because he fell asleep before his shift and received a Corrective Action Notice. ECF Nos. 25 at 4, ¶ 11; 23-1 at 82. According to another Corrective Action Notice, Plaintiff also left work early around this time. ECF Nos. 23-1 at 35; 25-3. Plaintiff testified that his

---

[2]     It is unclear exactly what days Plaintiff worked in May and when he was late, *see* ECF Nos. 25 at 6, ¶ 17; 31 at 9-10, ¶ 14, but it is undisputed Plaintiff arrived late for work at least once and was suspended that day, ECF No. 23-1 at 41 (Plaintiff recounting he was suspended on a day where he was late). The exact dates and the number of late arrivals is not material given the plethora of other work-place violations.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 6

supervisor, Jean Luc Gibassier, suspended him and told him to go home after he arrived late for work.  ECF No. 23-1 at 40-41; *see* ECF No. 25-3 at 2.  Mr. Gibassier explained:

> I suspended [Plaintiff] because he had many, many, not only late, but also leaving early.  Pretty much making his own schedule.  That was the -- the start.  I said, you know, I cannot – "That doesn't work here.  You cannot make your own schedule."

ECF No. 30-2 at 3.

In early May 2015, Vice President of Safeway, Dan Valenzuela, visited Plaintiff's department and was upset and not pleased with the condition.  ECF No. 23-1 at 32-34.  After the visit, Safeway management began drafting a Corrective Action Notice to deliver to Plaintiff.  ECF Nos. 25 at 4; 25-2.  According to the Corrective Action Notice, the meat rack was "way below gold standards" on May 6, 2015 when "our president, Dan Valenzuela paid us a visit," including violations of "proper handling of meat products, quality of wrapping, [and] proper trimming" resulting in "lost revenues, high shrink, [and] loss of customer confidence."  ECF No. 25-2 at 2.

According to another Corrective Action Notice, a May 11, 2015 audit "found several critical violations", including "no dates on product in the meat cooler"; no country of origin (COOL) information on case products in the meat cooler; "[p]re-trim violations; "[n]o stickers on several Hamburger meat

packages"; [b]oxes on the floor in the Meat cooler"; and the "[w]hole Department

not on schematics." ECF No. 25-4 at 2. These failures violated Safeway policies,

ECF Nos. 25 at ¶¶ 15-16; 25-4 at 2, and Defendant explains that failure to abide by

COOL practices could result in negative surveillance audits with the U.S.

Agriculture Department. ECF No. 25 at ¶ 16. According to the Notice, the impact

of the violations included "lost revenues, high shrink, loss of customer confidence,

potential COOL fines, [and] health department fines." ECF No. 25-4 at 2.

B. **Leave**

*"A few days after"* Gibassier suspended Plaintiff, Plaintiff applied for

medical leave of absence so he could attend an alcohol detoxification and

treatment program. ECF No. 23-1 at 41. Plaintiff requested a leave of absence

beginning May 11, 2015 and ending on July 2, 2015. ECF Nos. 27-1 at 118; 23-1

at 85. Safeway provisionally granted Plaintiff's request on May 18, 2015, ECF

No. 23-1 at 87, and formally granted Plaintiff's request for medical leave on June

19, 2015, ECF No. 23-1 at 89.

Plaintiff planned on going to an alcohol rehabilitation program immediately,

but was not able to get in until July 2, 2015; Plaintiff completed the alcohol

rehabilitation program by the end of July, 2015, but his doctor did not release him

to go back to work until November 4. ECF No. 27-1 at 118. Pursuant to the

doctor's orders, Plaintiff requested an extended leave of absence by a couple of months. ECF Nos. 23-1 at 44; 25-8. Notably:

- Plaintiff's doctor wrote a letter to Plaintiff dated July 6, 2015 "confirm[ing] that [Plaintiff's] disability is being extended for at least the next two months as [Plaintiff is] just now being admitted for inpatient treatment of alcoholism." ECF No. 25-8.

- In a letter from Defendant to Plaintiff dated July 14, Defendant informed Plaintiff that his FMLA leave ended August 4, 2015 and that Defendant approved of Plaintiff's leave of absence until September 3, 2015. ECF No. 25-9 at 2.

- Plaintiff's doctor wrote a letter to Plaintiff dated September 18, 2015 in which he states: "[d]ue to worsening medical condition [you] are advised not to return to work for 2 weeks, until next follow up." ECF No. 25-10 at 2.

- Plaintiff's doctor wrote a letter to Plaintiff dated October 28, 2015 in which he states: "[t]his is to confirm that you are able to return to work full-time without restriction on 11/04/2015." ECF No. 25-10 at 3.

- In a letter from Defendant to Plaintiff dated November 5, 2015, Defendant informed Plaintiff that he was approved for leave until November 4, 2015. ECF No. 25-11 at 2.

C. **Planned return to work**

Plaintiff contends he was terminated on July 29, 2015, because he "had contacted Peggy to come back to work and [he] wasn't being put back to work." ECF No. 27-1 at 119. "Peggy" is a union representative, not a Safeway employee. ECF No. 27-1 at 119. Plaintiff admits he was not medically cleared to go back to work until November and testified that, although the doctor did not release him, "[h]e would have released me at any day." ECF No. 27-1 at 119. At the hearing, Plaintiff's counsel explained that when Plaintiff learned he may not get his position as meat department manager in July, Plaintiff worked with his doctor to extend his medical leave. In other words, Plaintiff claims he could get his doctor to release him for work any day, despite that his doctor wrote on July 6, 2015 that Plaintiff's disability is being extended at least 2 more months. ECF No. 25-8. At the hearing, the Court asked Plaintiff's counsel to identify the facts supporting his contention that Plaintiff attempted to return to work in July and that Safeway would not let him. Counsel for Plaintiff cited to Plaintiff's own testimony where Plaintiff mentioned he talked with Peggy Vines, a union representative, not a Safeway employee or agent. *See* ECF No. 27-1 at 103 (discussed return to work with Peggy

Vines), 112 (discussion with Peggy Vines), 119 (discussing contact with Peggy Vines), and 120 (bald statement that Safeway did not put Plaintiff back to work).

Plaintiff later worked with his union and Safeway for a planned return to work in November, 2015. However, Defendant did not then have an open meat department manager position and the Collective Bargaining Agreement between Safeway and its union employees (including Defendant) would not allow Plaintiff to "bump" another meat department manager out of position; rather, the union and Safeway reached an agreement that Plaintiff would return as a meat cutter. ECF Nos. 25 at 7, ¶ 22; 25-12.

According to Mr. Mullings, he was informed that Plaintiff would be transferring to his store. Mr. Mullings testified he was "excited about the prospect of [Plaintiff] working in my department because [Plaintiff] was experienced and [Mr. Mullings] was planning on taking vacation time." ECF No. 24 at 3, ¶ 11. Mr. Mullings recalled the following:

> [Plaintiff] was scheduled for three shifts in mid-November. I recall [Plaintiff] informing me via text or phone call at some point that he came to the store personally to view his shift schedule; I did not see or speak to him if he did. On the day before his first scheduled shift, [Plaintiff] called me and asked for that day off. I asked Berman [the store manager], who refused the request, and relayed the denial to [Plaintiff]. [Plaintiff] did not show up for his first scheduled shift. I called to ask where he was, and [Plaintiff] told me [he] probably wouldn't be coming in at all and that his lawyer said this was in his best interest. [Plaintiff] did not show for his second and third shift. None of these absences were excused. A few days after [Plaintiff] missed his third and final scheduled shift, he called me and informed me he

would not be coming back at all, and that his lawyer advised him that would be in his best interests.

ECF No. 24 at 3, ¶¶ 12-14.  According to Plaintiff, Mr. Mullings told Plaintiff that he "would be highly scrutinized" and that Mr. Mullings would "write [Plaintiff] up for corrective actions at every point in time he could."  ECF No. 27-1 at 116.  Mr. Mullings denies this occurred.  ECF No. 24 at 3-4, ¶ 15.

Defendant deemed Plaintiff's three consecutive no-shows to be a voluntary resignation pursuant to Safeway policy and administratively terminated his employment on November 25, 2015.  ECF No. 22 at 4-5, ¶ 6.

Plaintiff filed suit in the Douglas County Superior Court on September 19, 2016 and Defendant removed the matter to this Court based on diversity jurisdiction, 28 U.S.C. § 1332(a).  ECF No. 1.

## DISCUSSION

Defendant argues that Plaintiff's claims fail as a matter of law.  ECF No. 21 at 6-7.  For the reasons discussed below, the Court agrees.

A. **Washington Law Against Discrimination (WLAD)**

Plaintiff alleges that his disability was a substantial factor in his termination and that Defendant failed to accommodate Plaintiff's disability.  Plaintiff argues Defendant is therefore liable for discrimination under the Washington Law Against Discrimination (WLAD).

1          1.  *Discrimination*

2          The WLAD "makes it an unfair practice for any employer ... [t]o discharge

3   or bar any person from employment because of . . . the presence of any sensory,

4   mental, or physical disability." *Brownfield v. City of Yakima*, 178 Wash. App. 850,

5   873 (2014) (quoting Wash. Rev. Code § 49.60.180).  "An employee claiming

6   discrimination must first prove a prima facie case of discrimination and, if he or

7   she does so, then the burden shifts to the employer to present evidence suggesting a

8   nondiscriminatory reason for [the termination]." *Id.* (quoting *Swinford v. Russ*

9   *Dunmire Oldsmobile, Inc.,* 82 Wash.App. 401, 413-14 (1996)).  "If the plaintiff

10  establishes a prima facie case, the burden of production—but not persuasion—then

11  shifts to the employer to articulate some legitimate, nondiscriminatory reason for

12  the challenged action." *Villiarimo*, 281 F.3d at 1062 (citing *McDonnell Douglas v.*

13  *Green,* 411 U.S. 792, 802 (1973).  "If the employer does so, the plaintiff must

14  show that the articulated reason is pretextual 'either directly by persuading the

15  court that a discriminatory reason more likely motivated the employer or indirectly

16  by showing that the employer's proffered explanation is unworthy of

17  credence.'" *Id.* (quoting *Chuang v. University of California Davis,* 225 F.3d 1115,

18  1123 (9th Cir. 2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S.

19  248, 256 (1981))).

20

To avoid summary judgment, a plaintiff "must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996). "A plaintiff cannot create a pretext issue without some evidence that the articulated reason for the employment decision is unworthy of belief." *Brownfield*, 178 Wash. App. at 874 (quoting *Kuyper v. Dep't of Wildlife,* 79 Wash.App. 732 (1995)). Rather, the plaintiff must produce "specific, substantial evidence of pretext." *Id.* (citation omitted). "To do this, a plaintiff must show, for example, that the reason has no basis in fact, it was not really a motivating factor for the decision, it lacks a temporal connection to the decision or was not a motivating factor in employment decisions for other employees in the same circumstances." *Id.* (quoting *Kuyper*, 79 Wash.App at 738-39). "Although a plaintiff may rely on circumstantial evidence to show pretext, such evidence must be both specific and substantial." *Villiarimo*, 281 F.3d at 1062 (citing *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1222 (9th Cir.1998)).

First, Plaintiff has not presented a prima facia case of discrimination. "The elements of a prima facie case of disparate treatment disability discrimination are that the employee was: [1] disabled, [2] subject to an adverse employment action, [3] doing satisfactory work, and [4] discharged under circumstances that raise a reasonable inference of unlawful discrimination." *Brownfield*, 178 Wash. App. at

873.  (quoting *Callahan v. Walla Walla Hous. Auth.,* 126 Wash.App. 812, 819–20 (2005)).  Plaintiff has failed to demonstrate he was doing satisfactory work. Indeed, the evidence in the record clearly demonstrates Plaintiff was not fulfilling the standards required by Safeway, to say the least, before taking leave, and then he failed to even show up for work upon return from leave.

Second, Defendant has presented ample evidence demonstrating its decision to offer Plaintiff a different position and, later, to terminate Plaintiff was based on valid work-place concerns, and Plaintiff has failed to show the reason is pretextual. It is undisputed that Defendant put Plaintiff in the position as a meat cutter because the meat department manager position was no longer open and Safeway could not "bump" the meat department manager to give Plaintiff the position.  Further, it is undisputed that Defendant terminated Plaintiff pursuant to store policy (three no-shows is a voluntary quit) after Plaintiff chose to not show up for three shifts in a row, telling his meat department manager he was not coming back upon advice of counsel.

Plaintiff has presented no evidence that would persuade the court a discriminatory reason more likely motivated the employer.  Plaintiff has also failed to provide any evidence that the employer's proffered explanation is unworthy of credence.  Notably, Plaintiff claims he was "unjustly terminated for putting [himself] into rehab[,]" ECF No. 27-1 at 117, but he admitted that he had no facts

to support the contention, ECF No. 27-1 at 119-20. Although the complained of actions took place after Plaintiff took leave to attend alcohol rehabilitation, (1) the position Plaintiff wanted was not open because Plaintiff left for six months and Safeway had to fill the vacant position and (2) Plaintiff was terminated after not returning to work, which happened after he took leave, so the proximity of time is incidental and fully explained. Further, although Plaintiff asserts he would be subjected to scrutiny and would be written up if he made a mistake, this is a reasonable condition of employment given Plaintiff's past poor performance and Defendant's legitimate interest in maintaining its policies, especially health and safety issues in the meat department. Moreover, increased scrutiny is not an adverse action. *See Kortan v. California Youth Auth.*, 217 F.3d 1104, 1112-13 (9th Cir. 2000) (finding there was no adverse action taken despite the plaintiff's claim of "increased criticism" at the workplace).

While Plaintiff asserts he tried to return to his position in late July and Defendant did not let him, *see* ECF Nos. 1-1 at 4, ¶ 2.4; 27-1 at 119, it is undisputed that Plaintiff was not cleared to return back to work by his doctor until November. Indeed, as noted above, Plaintiff's doctor wrote a letter to Plaintiff dated July 6, 2015 "confirm[ing] that [Plaintiff's] disability is being extended for at least the next two months as [Plaintiff is] just now being admitted for inpatient treatment of alcoholism." ECF No. 25-8. In a letter from Defendant to Plaintiff

dated July 14, Defendant informed Plaintiff that his FMLA leave ended August 4, 2015 and that Defendant approved of Plaintiff's leave of absence until September 3, 2015. ECF No. 25-9 at 2. These letters directly contradict Plaintiff's claim that he was able and willing to return to work at the end of July, yet Defendant did not let him. Moreover, the Court does not ignore the fact that Plaintiff claims he could have convinced his doctor to release him for work any day, but neither the Plaintiff nor his doctor did so. ECF No. 27-1 at 119. In any event, Plaintiff has not presented any evidence Safeway would not let him return to work in July; the only thing Plaintiff points to is his own deposition where he mentions he spoke with a union representative, not Safeway. This settles the issue as to whether Plaintiff attempted to return to work in July.

Plaintiff otherwise argues that Defendant treated other similarly situated employees differently than Plaintiff, but Plaintiff does not point to anyone that deliberately declined to show up for work three times without being terminated. Nor does Plaintiff point to any employee with such drastic failures to abide by company policies.

2. **Failure to Accommodate**

"[E]mployers have an affirmative obligation to reasonably accommodate the sensory, mental, or physical limitations of [] employees unless the employer can demonstrate that the accommodation would impose an undue hardship on the

conduct of the employer's business." *Doe v. Boeing Co.*, 121 Wash. 2d 8, 18 (1993) (citing WAC 162–22–080). "[T]he scope of an employer's duty to accommodate an employee's condition is limited to those steps reasonably necessary to enable the employee to perform his or her job." *Id.* (citation omitted).

Plaintiff does not identify any request Defendant actually denied. Rather, it is undisputed that Defendant fulfilled every request to accommodate Plaintiff's alleged disability. Defendant granted every leave request and allowed Plaintiff to return to work after taking a six-month leave of absence. While Plaintiff wanted his position as meat department manager, this request was not a request to accommodate his disability, as there is nothing that precluded Plaintiff from working as a meat cutter. Defendant necessarily filled the meat department manager position while Plaintiff was on extended leave, leave that exceeded the 12-week FMLA grace period, and was prohibited from "bumping" the manager pursuant to the union contract.

### 3. *Conclusion*

Defendant has not presented any evidence that Defendant discriminated against Plaintiff because of his disability or otherwise failed to accommodate his disability. Defendant is entitled to summary judgment on this issue.

//

//

B. **Washington Family Leave Act (WFLA)**

Plaintiff claims Defendant is liable under the Washington Family Leave Act because Defendant did not return Plaintiff to his original position upon returning to work and Defendant retaliated against Plaintiff for taking leave.

"The WFLA is patterned on and construed in accordance with the FMLA." *Shelton v. Boeing Co.*, 702 F. App'x 567, 568 (9th Cir. 2017). "The FMLA . . . simply guarantees that an employee's taking leave will not result in a loss of job security or in other adverse employment actions." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). As such, the FMLA generally requires an employer to return an employee to the same position after taking sick leave and prohibits employers from considering "the taking of FMLA leave as a negative factor in employment actions." *Id.*; 29 U.S.C. § 2614(a); 29 C.F.R. § 825.220(c); *see Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001).

1. ***Right to position held before taking leave***

Under the FMLA, although employees (generally) have a right to be returned to their position upon returning to work, this is only available if the employee returns to work within the allotted 12 weeks for medical leave, and it is undisputed Plaintiff did not return to work until well-beyond the running of the 12 weeks. *Hibbs v. Dep't of Human Resources*, 152 Fed. App'x 648, 649 (9th Cir. 2005) ("The protections of the FMLA—entitling an employee to return to his job

as if he had never left, …do not survive the expiration of the twelve-week FMLA period.").  Plaintiff claims he attempted to return before the 12 week period ended in late July, but at this time he was in the midst of a 2-month extension of leave pursuant to his doctor's order (dated 7/6/2015), following his own request for leave (approved 6/17/2015), as discussed above.

2. *"Interference" with FMLA rights*

"[A]n employee may prevail on a claim that an employer interfered with her rights by terminating her in violation of FMLA by showing, 'by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her.'"  *Xin Liu*, 347 F.3d at 1135-36 (quoting *Bachelder*, 259 F.3d at 1125).  The Ninth Circuit has expressly held that the *McDonnel Douglas* burden shifting approach (applied to disability discrimination claims) does not apply to FMLA interference claims.

A plaintiff "can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both."  *Xin Liu*, 347 F.3d at 1136 (quoting *Bachelder*, 259 F.3d at 1125).  For example, in *Bachelder*, the employer's stated reason for termination – her absences – was direct evidence the absences (assuming they were absences covered by the FMLA) were a "negative factor" in the decision to terminate the employee.  In *Xin Liu*, on the other hand, the Ninth Circuit found there was sufficient indirect evidence to support the

plaintiff's claim that her employer considered her leave as a "negative factor" in her termination.  *Id.* at 1137; *see also Allison v. Hous. Auth. of City of Seattle*, 118 Wash. 2d 79, 97-98 (1991).

In *Xin Liu*, the plaintiff worked for Amway as a scientist researching and developing plant concentrates.  347 F.3d at 1130.  Liu went on maternity leave, and her supervisor had to work on nights and weekends to "pick up the slack".  *Id.* A few weeks before her planned return to work, her supervisor called her to confirm her return date; Liu asked for an extension and her supervisor denied her request immediately.  *Id.*  A week later, the supervisor again demanded that Liu provide a firm return date.  *Id.*  Liu asked for an extension again and her supervisor ultimately agreed to a shorter extension than she requested.  *Id.*  Liu again requested an extension of leave to help her terminally ill father in China.  Her supervisor refused repeatedly, but eventually gave Liu a one-week extension after Liu contacted the Human Resources Department.  *Id.* at 1130-31.  Shortly before Liu had planned to leave for China, her supervisor requested she visit the company for her annual performance evaluation.  *Id.* at 1131.  At the meeting, her supervisor told her he was assigning her primary project to another employee and that the company was downsizing.  *Id.*  The supervisor gave her a score 19% lower than her previous evaluation she had received six months earlier.  *Id.*

> Liu's score placed her at the bottom of her department.  [Her supervisor] gave her the lowest possible score, a "one," in several categories including

written communication, a category in which she had excelled in her previous evaluation. He also gave her a "one" in several "soft skills" such as "encourages self-development" and "holds people accountable for meeting goals." During the entire year of 1998, [the supervisor] did not give a "one" to a single employee other than Liu. Liu's prior evaluation under her former supervisor, David Groh, was very positive. He gave her very high scores, a 3.1 overall, and remarked that she was an excellent scientist with very good written communication skills. Scores in her department ranged from 2.8 to 3.1, making Liu's score one of the two highest in a department of four. Groh testified that he could not recall ever criticizing her work either to her directly or to any other supervisor.

*Id.* at 1131 (footnote omitted).

The Ninth Circuit reviewed the evidence in detail, finding there was sufficient evidence for a jury to find Liu taking leave was a factor in her termination:

Liu's evidence that [her supervisor's] subjective evaluation served as the central, if not sole, factor in her termination is significant. Where termination decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted because such evaluations are particularly "susceptible of abuse and more likely to mask pretext." *Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3d Cir. 1990) (internal citation omitted); *see also Lujan v. Walters,* 813 F.2d 1051, 1057 (10th Cir. 1987) (noting that "subjective criteria as 'dedicated' and 'enthusiasm' may offer a convenient pretext for giving force and effect to prejudice, and can create a strong inference of employment discrimination"). Here, Liu's lowest scores were, as [the supervisor] explained, in "soft skills" that "cannot be taught," such as "being upbeat." A jury could find these categories vague enough to be suspect given the surrounding events.

The 19% drop in overall score from her former employee evaluation may also create an inference of impermissible motivation. *See Winarto v. Toshiba Am. Elecs. Components, Inc.,* 274 F.3d 1276, 1286 (9th Cir. 2001) (holding that "[a]n unwarranted reduction in performance review scores can constitute evidence of pretext in retaliation cases" under Title VII), *cert. dismissed,* 537 U.S. 1098 (2003); *cf. Hodgens,* 144 F.3d 151, 170-171 (1st

Cir. 1998) (holding that prior bad performance over two year span in evaluations weakened support for allegation that the employee's termination was in violation of FMLA).

This evidence, combined with [the supervisor's] behavior toward Liu regarding her leave suggests that the evaluation may have been tainted with his attitude towards her leave. His repeated denials of her leave and comments about his increased work-load support this contention. Finally, the proximity in time between the leave and her termination also provides supporting evidence of a connection between the two events. *Hodgens,* 144 F.3d at 168 (holding that the "close temporal proximity between two events may give rise to an inference of causal connection.").

*Id.* at 1136-37 (footnote omitted; citations altered).

Here, as discussed above, Plaintiff has not presented any evidence that Defendant considered Plaintiff's taking of leave a "negative factor" in assigning Plaintiff to the meat cutter position and then terminating him after he failed to show up for work. Unlike in *Xin Liu*, there is nothing in the record showing Defendant or any of its agents complained about Plaintiff taking leave. While Plaintiff was written up for poor performance, this occurred *before Plaintiff requested leave* and the evidence supports the legitimacy of the evaluation(s). Further, unlike in *Xin Liu*, the evaluations were not based on subjective categories, but rather reflected the objective factual findings of his performance. Finally, although Plaintiff was assigned a different position and terminated *after* taking leave, it is undisputed that Defendant could not return Plaintiff to his original position because that position had been filled (and they could not "bump" the

person holding the position pursuant to an agreement with the union) and Defendant was terminated after he failed to show up for work. Plaintiff asserts he was told that he would be highly scrutinized and written up, but this scrutiny and attention to policies is clearly reasonable in light of Plaintiff's past performance. Moreover, mere threats of increased criticism do not constitute an adverse employment action. *See Kortan*, 217 F.3d at 1112-13 (finding there was no adverse action taken despite the plaintiff's claim of "increased criticism" at the workplace).

This is not a case where there is at least "thin" evidence of an improper motive. *See Allison v. Hous. Auth. of City of Seattle*, 118 Wash. 2d at 97-98 ("thin, but sufficient testimony" where employer made remarks about "little old ladies", became hostile towards the plaintiff after learning her true age, and gave the plaintiff an allegedly unwarranted reprimand, among other things). Rather, this case is more like *Shelton v. Boeing*, 702 F. App'x at 568, where there is simply no evidence to support Plaintiff's claim of improper motive. In *Shelton v. Boeing*, the Ninth Circuit affirmed the district court's grant of summary judgment to the defendant, explaining no reasonable jury could find for the plaintiff where:

> [the defendant] submitted evidence showing that it administered the [adverse actions] because he refused to comply with his manager's instructions to contact her directly before taking any absence, not because he exercised his right to FMLA leave" and the plaintiff "provided no additional evidence that could possibly establish that the nature of his FMLA leave was a negative factor, or even a factor at all, in Boeing's decision to discipline him.

*Shelton v. Boeing Co.,* 702 F. App'x at 568. As in *Shelton*, the Defendant here has presented ample evidence supporting the legitimacy of its actions and Plaintiff has not presented any evidence to the contrary, as discussed above.

C. **Termination in violation of public policy**

A claim for wrongful discharge is a "narrow exception" to Washington's general rule of employment at will. *Martin v. Gonzaga University*, ___Wash.2d ___, 2018 WL 4355364, *4 (Sept. 13, 2018). "[T]o prevail on a cause of action, a plaintiff employee must demonstrate that his or her "discharge may have been motivated by reasons that contravene a clear mandate of public policy[,]" then, "the burden shifts to the employer to prove that the dismissal was for reasons other than those alleged by the employee." *Id.* (citing *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 232-33 (1984). The tort for wrongful discharge in violation of public policy has generally been limited to four scenarios: "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistle-blowing." *Id.* (citing *Gardner v. Loomis Armored, Inc.*, 128 Wash.2d 931, 936, 913 P.2d 377 (1996)). Only when a claim does not fall within one of these four categories may the more refined Perritt

analysis be applied.  *See Martin*, 2018 WL 4355364, *4 (citing, inter alia, R*ose v. Anderson Hay & Grain Co.*, 184 Wash.2d 268, 277-78, 287 (2015) ("We note that in other instances, when the facts do not fit neatly into one of the four above-described categories, a more refined analysis may be necessary.  In those circumstances, the courts should look to the four-part Perritt framework for guidance.  But that guidance is unnecessary here.").  The Perritt test has four factors: "(1) The plaintiffs must prove the existence of a clear public policy (the clarity element). (2) The plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy (the jeopardy element). (3) The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the causation element). (4) The defendant must not be able to offer an overriding justification for the dismissal (the absence of justification element)."  *Martin*, 2018 WL 4355364, *4 (citing *Gardner*, 128 Wash.2d at 936 and HENRY H. PERRITT JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES (1991)).

Plaintiff argues the "WLAD expresses a clear policy against discharge from employment because of discrimination."  ECF No. 28 at 16.  However, as discussed above, Plaintiff has not presented any evidence supporting his claim of discrimination/retaliation/interference, however phrased.  As such, even if the Court were to adopt Plaintiff's theory of liability, Plaintiff has not demonstrated an

adverse action was taken with an improper motive and Defendant has clearly

shown there was an "overriding justification for the dismissal" in any event.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

     Defendant Safeway Inc.'s Motion for Summary Judgment (ECF No. 21) is

**GRANTED**.

     The District Court Clerk is directed to **enter** this Order and Judgment

accordingly, provide copies to counsel, and **close** the file.

     **DATED** September 25, 2018.



              THOMAS O. RICE
          Chief United States District Judge